THIS OPINION IS A
PRECEDENT OF THE TTAB

Oral Hearing:                                          Mailed:
April 26, 2011                                 November 21, 2011

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Top Tobacco, L.P.

v.

North Atlantic Operating Co., Inc.

_____

Consolidated:
        Opposition No. 91157248
        Opposition No. 91157250
        Opposition No. 91180231
        Cancellation No. 92043186

_____

Lee J. Eulgen of Neal, Gerber & Eisenberg for Top Tobacco,
L.P.

Arlana S. Cohen of Cowan, Liebowitz & Latman, P.C. for North
Atlantic Operating Co., Inc.

_____

Before Kuhlke, Wellington, and Wolfson,
Administrative Trademark Judges.

Opinion by Wellington, Administrative Trademark Judge:

    North Atlantic Operating Co., Inc. ("North Atlantic")

filed applications to register the following marks:

        1. CLASSIC AMERICAN BLEND (in typed form) for
           "smoking tobacco" in International Class 34;[1]

_____

[1]  Application Serial No. 76357922 (filed on January 11, 2002) is
based on an allegation of first use in commerce on April 14,



2.
     For "cigarettes, smoking tobacco, pocket
machines for rolling cigarettes, cigarette tubes,
pocket machines for filling cigarette tubes, and
filter tips for cigarettes" in International Class
34;[2] and

3. CLASSIC AMERICAN BLEND (in standard characters)
   for "loose tobacco" in International Class 34.[3]

North Atlantic is also the owner of a registration for

the mark ZIG ZAG CLASSIC AMERICAN BLEND (in typed form) for

"smoking tobacco" in International Class 34.[4]

In each of North Atlantic's aforementioned applications

and registration, the wording AMERICAN BLEND has been

disclaimed.

Top Tobacco, L.P. ("Top") has opposed registration of

North Atlantic's marks and seeks to cancel its registration.

Top alleges priority and likelihood of confusion as its

ground for each opposition and as one of two pleaded grounds

---

1999, under Section 1(a).  This application is subject of the
parent proceeding, Opposition No. 91157248.
[2] Application Serial No. 76357543 (filed on January 11, 2002) is
based on an allegation of a bona fide intent to use the mark in
commerce, under Section 1(b).  This application is subject to
Opposition No. 91157250.
[3] Application Serial No. 78781115 (filed on December 27, 2005)
is based on an allegation of first use in commerce on April 1,
1999, under Section 1(a).  This application is subject to
Opposition No. 91180231.
[4] Registration No. 2780643 issued on November 4, 2003.  Section 8
affidavit has been accepted by the USPTO. This registration is
subject to Cancellation No. 92043186.

for cancellation.  Specifically, by way of the notices of opposition and petition to cancel, Top alleges that it has "for many years used the mark CLASSIC CANADIAN in connection with the distribution and sale of smoking tobacco"; that its CLASSIC CANADIAN mark "has acquired a distinctiveness and secondary meaning signifying Top Tobacco and its goods"; that it is the owner of Registration No. 1922338 for the mark CLASSIC CANADIAN for "tobacco";[5] and that North Atlantic's proposed and registered marks, for the identified goods, are "confusingly similar to Top Tobacco's federally-registered CLASSIC CANADIAN mark" and are "likely to cause confusion or mistake, or to deceive purchasers, in that purchasers would be likely to believe that [North Atlantic's] goods are Top Tobacco's goods, or are in some way legitimately connected with, sponsored by, or approved by Top Tobacco in violation of [Section 2(d)]."

As a second ground in the cancellation proceeding, Top alleges that North Atlantic failed to use its registered mark in commerce prior to obtaining the registration. Specifically, Top alleges that North Atlantic "has not used and does not use the mark ZIG ZAG CLASSIC AMERICAN BLEND"; that "as demonstrated by the specimen...[North Atlantic]

---

[5] Issued on September 26, 1995; renewed.  Section 8 affidavit accepted and Section 15 affidavit acknowledged by USPTO.  The term CANADIAN has been disclaimed.

displays the mark ZIG ZAG in a stylized font that is larger than, visually separated from, and more prominent and identifiable than the phrase CLASSIC AMERICAN BLEND..."; and that "[a]s a result, if anything, consumers will perceive [North Atlantic's] products as displaying the mark ZIG ZAG, and possibly, also as a separate and distinct stylized mark comprised of the terms CLASSIC AMERICAN BLEND, but not the registered mark."[6]

By way of its answers to the notices of opposition and the petition for cancellation, North Atlantic has denied the salient allegations of the likelihood of confusion and non-use (of the registered mark) grounds.

The opposition and cancellation proceedings have been consolidated, tried on a single record and the merits argued in the same trial briefs.

Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b)(1), the files of the opposed applications and registration that Top seeks to cancel.

Top filed the testimonial deposition transcripts, with exhibits, of: Seth Gold, Executive Vice President and

---

[6] In its trial brief, North Atlantic argues that the allegations constitute an impermissible attack on the sufficiency of the specimens submitted by North Atlantic in support of the application that matured into the registration. However, and as explained previously in the Board's November 4, 2004 order, the allegations state a claim upon which relief may be granted.

General Counsel for Top and Steven Sandman, Vice President of Sales and Marketing for Republic Tobacco, an affiliate of and distributor for Top. Under notice of reliance, Top also submitted the following: a status and title copy of its pleaded Registration No. 1922338, a copy of an article from Roll Your Own Magazine Volume IV, No. 1 (Winter/Spring 2003), a copy of North Atlantic's responses to Top's Third Set of Requests for Admissions, a copy of North Atlantic's responses to Top's First Set of Interrogatories, a copy of the direct examination, and exhibits discussed therein, from the discovery deposition of James Dobbins, an officer for North Atlantic, and a copy of the direct examination, and exhibits discussed therein, from the Rule 30(b)(6) deposition of North Atlantic.

North Atlantic submitted the testimonial deposition transcript, with exhibits, of James Murray, Senior Vice President for Business Planning at National Tobacco Company, the operating company for North Atlantic. Under notices of reliance, applicant submitted copies of the following: printouts from Tobacco Encyclopedia, printouts of articles, copies of third-party registrations, printouts from the third-party website www.ryorevolution.com, Top's responses to North Atlantic's first set(s) of requests for admissions in several of the consolidated proceedings, Top's responses (including supplemental responses) to certain of North

Atlantic's First Set of Interrogatories, Top's responses to certain of North Atlantic's document requests, and a portion of the cross-examination of the discovery deposition transcript of Thomas J. Helms, III and Exhibits Nos. 1-8 thereto.

Top and North Atlantic filed trial briefs, including a reply brief from Top.

Top's Evidentiary Objections

Top has raised several objections to several of North Atlantic's evidentiary submissions.[7]

In response, North Atlantic contends that several of the raised objections are moot because North Atlantic does not rely on the objected-to evidence. Specifically, North Atlantic states that it does not rely on the cross-examination portion of the Helms testimony, and related exhibits; the objected-to portions of the cross-examination of Mr. Sandman; and Murray Dep. Exhibit 37 (also referred to as "NAOC Exhibit 37"). Because North Atlantic does not rely on the aforementioned evidence, we do not consider this evidence and any objections thereto are moot.

---

[7] Top filed a Statement of Objections, attached as an appendix to its trial brief. Several objections were previously raised by way of a motion to strike and were addressed in the Board's July 14, 2010 order. We do not revisit these objections. To the extent that certain previously raised objections were deferred until final hearing, they are addressed herein.

*Murray Dep. Exhibs. 24-31, 35-36*

Top seeks to exclude Murray Dep. Exhibits 24-31 and 35-36 (also referred to as "NAOC Exhibs. 24-31, 35-36") on the ground that North Atlantic failed to properly authenticate the materials. In general, these exhibits comprise samples of tobacco product packaging that North Atlantic seeks to rely upon for purposes of showing "that these products exist and they contain a reference to 'Classic' and/or a country designation to designate the place where the tobacco comes from." Response to Objections, p. 3. North Atlantic argues that these exhibits were authenticated by its witness, Mr. Murray, as well as Top's witnesses. North Atlantic also argues that the documents are self-authenticating under Federal Rule of Evidence 902(7).

We agree with Top that the aforementioned exhibits were not properly authenticated by Mr. Murray (or any other witness) because there is no testimony as to how and where the product packaging was obtained.

As to North Atlantic's argument that the exhibits are self-authenticating under FRE 902(7), this rule provides:

> Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following...
> (7) Trade inscriptions and the like. Inscriptions, signs, tags, or labels purporting to have been affixed in the course of business and indicating ownership, control, or origin.

In response to the self-authentication argument, Top argues that North Atlantic "misunderstand[s]" the rule but seems to acknowledge that the rule does allow self-authentication of the exhibits to a certain extent. Specifically, Top states "[t]he fact that the third party materials are authenticated to show that they originated from a certain company[] does not mean that they have been authenticated as an example of a product that is regularly distributed in the United States."  Objections Reply, p. 4.

Case law interpreting Rule 902(7) is sparse, particularly in trademark matters.  North Atlantic has cited to a district court decision that addresses the issue of whether third-party plastic credit cards, bearing a trademark, are self-authenticating:

> Although the court has found little case law discussing Rule 902(7), the court believes that the rule is properly applied here because each card displays a label or inscription indicating its origin.  However, the court notes that defendant has offered no evidence indicating the number of holders of each card or the geographic region covered by each card.  Further, there is no evidence indicating whether or not these cards are currently in use.  Accordingly, the court finds that this evidence has little probative value.

*Universal Money Centers, Inc. v. American Tel. and Tel. Co.*, 17 USPQ2d 1435 (D. Kan. 1990).

In similar fashion, we find FRE 902(7) applicable in this matter and the exhibits are self-authenticating. However, as the District Court pointed out, the materials

8

have limited probative value without further evidence regarding their actual use in commerce.  In this case, the testimony regarding the exhibits, i.e., packaging, labels, canisters, etc., does not establish that they were actually used in commerce or what degree of exposure, if any, there may have been on consumers.  Thus, the exhibits are essentially limited to what they show on their face.  They may be used in the same manner as third-party registrations based on use in commerce, namely, to demonstrate any suggestive meaning of the term "Classic" as it is found on packaging for tobacco-related goods.  The witnesses' testimony, to the extent they have any personal knowledge of the goods identified by the exhibits may also be of relevance.  For example, while Exhibit 24 is merely packaging that has not been demonstrated to have been used in commerce, Mr. Sandman testified that he was familiar with the product "Stoker's Chewing Tobacco" (see Sandman Dep. 54:7-24).  Likewise, Mr. Murray's testimony that he recognizes Exhibits 28 and 30 comprising packaging or cartons for "BaliShag Classic European handrolling tobacco" may also be considered (see Murray Dep. 71:16-25).

In sum, we find that Exhibits 24-31 and 35-36 are self-authenticating under FRE 902(7); however, they are not evidence that the labels or packaging shown or comprising the exhibits have been used in commerce.  To the extent that

any witnesses testified based on their personal knowledge regarding any products identified by the exhibits, the testimony may also be considered. We hasten to add that the Board is capable of weighing the probative value of all evidence in the record, bearing in mind any limitations that may be present, and we make all determinations based on the entire record.

*Cross-Examination of Gold*

Top has objected to the cross-examination of Mr. Gold as being beyond the scope of the direct examination. In response, North Atlantic disputes the characterization of the objected-to testimony as being outside the scope of direct examination and further states that it is only seeking to rely on Mr. Gold's testimony "regarding Top's knowledge of third parties' uses of the term 'Classic,'" and points specifically to page 143 of the deposition transcript. Essentially, this portion of objected-to testimony involves Mr. Gold's reaction to an exhibit and a discussion concerning whether the goods identified by the exhibit constitute a "tobacco product." Ultimately, the line of questioning and responses thereto on page 143 (Gold Dep. 143:3-24) have no bearing on our decision in the consolidated proceedings. Because the objected-to testimony, whether considered or not, would play no part in

our determinations in this matter, we decline to decide this
objection.

<u>The Parties and the RYO (or MYO) Tobacco</u>

The record establishes the following facts that are of
relevance in this proceeding.

Top and North Atlantic are competitors in the "roll
your own" (RYO) or "make your own" (MYO) tobacco industry,
an industry based on consumers purchasing loose tobacco and
related products to either roll or make their own
cigarettes.  Top is a market leader in this industry.  There
are several ways for consumers to roll or make their own
cigarettes, e.g., simply rolling the tobacco by hand into a
special cigarette paper, using a small device to assist with
the rolling, inserting the loose tobacco into pre-made
tubes, etc.  The parties, either by themselves or through
related companies, sell the actual tobacco, and related
products, under various brand names directly to wholesale
distributors and retailers.  The distributors sell to the
retailers who, in turn, offer these products directly for
purchase by the ultimate consumers.

Top sells a mainstream RYO tobacco under the marks TOP
and GAMBLER; however, it also sells specialty blend RYO
tobaccos.  The mainstream product is less expensive and some
purveyors sell the tobacco in larger one-pound bags.  The
analogy has been made that a specialty blend of tobacco is

akin to a microbrew beer.  These pouches or canisters of specialty RYO or MYO tobacco come in blends of tobacco leaves from different sources and may have flavoring added. Some blends of tobacco leaves are descriptively referred to as "European", "Turkish", "Oriental" and "American" (sometimes also referred to as "Virginia style").  These names do not necessarily indicate the geographic source for the tobacco contained in the pouch, but rather a style or flavor.  The tobacco may also be sold as "full flavor" or "menthol" or "light."  A six or seven-ounce container of loose RYO or MYO tobacco retails for approximately $20-30. The products may be purchased in tobacco shops, convenience stores and certain grocery stores.  The advertising of RYO or MYO related products is restricted by law; the goods may not be advertised on television, radio or in mainstream magazines or newspapers.  The goods may be advertised in adult or trade publications.  Point of sale displays are also frequently used to advertise the RYO or MYO tobacco and related goods, and may be found in the same retail stores in proximity to one another.

Standing

Top has established that it is the owner of the pleaded registration for the mark CLASSIC CANADIAN for tobacco and that said registration is valid and subsisting.  It is also clearly a competitor of North Atlantic in the RYO and MYO

12

markets.  Accordingly, Top has shown that it has a personal interest in this proceeding and proven its standing.  *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); and *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

We now address the merits of the grounds for opposition and cancellation.  Initially, we consider the ground of priority and likelihood of confusion which has been asserted in each consolidated proceeding.

<u>Priority</u>

Top's proof of ownership of its pleaded registration removes priority as an issue with respect to the goods, i.e., tobacco, covered by the registration, vis-à-vis the goods identified in the opposed applications.  *King Candy, Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

With respect to the petition to cancel North Atlantic's ZIG ZAG CLASSIC AMERICAN BLEND mark, Top must prove that it has a proprietary interest in the mark CLASSIC CANADIAN and that interest was obtained prior to either the filing date of North Atlantic's application for registration or the North Atlantic's date of first use.  *Herbko International Inc. v. Kappa Books Inc.,* 308 F.3d 1156, 64 USPQ2d 1375,

13

1378 (Fed. Cir. 2002); *Otto Roth & Co., Inc. v. Universal Corp.,* 640 F.2d 1317, 209 USPQ 40, 43 (CCPA 1981); *Miller Brewing Co. v. Anheuser-Busch Inc.,* 27 USPQ2d 1711, 1714 (TTAB 1993). North Atlantic has admitted that it did not use its registered mark prior to 1999,[8] and the underlying application for Top's registration was filed in 1992. *See* Trademark Act Section 7(c), 15 U.S.C. §1057 (c). *See also Larami Corp. v. Talk to Me Programs, Inc.,* 36 USPQ2d 1840 (TTAB 1995)(parties may rely on these constructive use (filing) dates for purposes of priority). Top has therefore established priority between its registered CLASSIC CANADIAN mark and North Atlantic's registered ZIG ZAG CLASSIC AMERICAN BLEND mark.

## Likelihood of Confusion

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). See also, *In re Majestic Distilling Co., Inc.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).

### *The Goods*

We initially address the *du Pont* factors involving the level of similarity or dissimilarity of the parties' goods. In this regard, we readily find that the parties' goods are

---

[8] North Atlantic's response to Admission Request No. 15.

legally identical because the identification in Top's registration, i.e., "tobacco," encompasses goods identified in each of North Atlantic's applications and registration, i.e., "smoking tobacco" or "loose tobacco."  Thus, the parties' respective goods, as identified, could include tobacco for pipes, cigars and cigarettes.  While we must entertain all such possible uses for the tobacco, as identified, this decision is focused primarily on the RYO or MYO tobacco market because the record and parties' arguments are directed thereto.  To the extent that the broader interpretation of the goods may be relevant, we address this in the appropriate portions of our decision.

As to the identified goods other than tobacco in one of North Atlantic's applications, namely, "cigarettes, pocket machines for rolling cigarettes, cigarette tubes, pocket machines for filling cigarette tubes, and filter tips for cigarettes," these goods are closely related Top's tobacco inasmuch as they are complementary.  That is, consumers of Top's RYO tobacco may use North Atlantic's related goods to roll or make their own cigarettes.  As noted below, these goods will be sold to the same classes of purchasers through similar trade channels.

Accordingly, this factor weighs in favor of finding a likelihood of confusion.

*Trade Channels and Class of Purchasers*

Because the goods are legally identical, with respect to the tobacco, we must presume that said tobacco would be found in the same channels of trade and be subject to purchase by the same consumers. See *Hard Rock Cafe Licensing Corp. v. Elsea*, 48 USPQ2d 1400 (TTAB 1998). In any event and as previously noted, the record demonstrates that all of the parties' goods, whether it be the tobacco itself or the pocket machines, tubes, filters, etc., are directed to the same class of purchasers, namely, persons interested in rolling or making their own cigarettes. The record also establishes that the parties' goods will likely be advertised in the same media, i.e., trade and adult magazines, and through point of sale displays that will likely be in proximity to one another in the same retail stores, e.g., tobacco specialty shops, convenience stores, etc. We further note that both parties sell their respective goods to wholesale distributors for such goods. In other words, the trade channels and class of purchasers are the same.

Thus, the factors involving trade channels and classes of purchasers weigh in favor of finding a likelihood of confusion.

*Purchasing Conditions:*
*Impulse v. Careful Consideration*

Although we have concluded that the classes of purchasers are the same, we must also consider the conditions under which the goods are likely to be purchased, e.g., whether on impulse or after careful consideration, as well as the degree, if any, of sophistication of the consumers.

North Atlantic argues that there are two levels of purchasers for the parties' goods, the wholesale distributors and the ultimate consumers, and that at both levels there is a sophisticated purchaser who is less prone to confusion between the two marks. As to the former, North Atlantic did not provide any evidence to support this argument, but relies on case law and treatise information in arguing that "it is reasonable to set a higher standard of care than exists for consumers." While we agree that it stands to reason that wholesale buyers should be accorded a higher degree of purchaser sophistication over the general public in terms of determining susceptibility to confusion, we have often noted that even consumers who exercise a higher degree of care are not necessarily knowledgeable regarding the trademarks at issue, and therefore immune from source confusion. *In re Wilson,* 57 USPQ2d 1863, 1865-66 (TTAB 2001); *In re Decombe,* 9 USPQ2d 1812, 1814-1815 (TTAB

17

1988) ("Being knowledgeable and/or sophisticated in a particular field does not necessarily endow one with knowledge and sophistication in connection with the use of trademarks.").

As to the consumers, North Atlantic argues that they too are exercising a higher degree of care because the parties' specialty blends of RYO or MYO tobacco invite a discerning buyer who is paying a premium for specialty blend over a "generic" RYO tobacco. We agree with North Atlantic that the evidence indicates that specialty blends are more expensive than non-specialty blends and purchasers will likely exercise more care in their purchase; however, we cannot ignore the fact that both parties' identifications of goods leave open the possibility that their marks may be used on the bulk or generic (less expensive) RYO tobacco. In such case, the buyers would not necessarily exercise any greater degree of caution and the goods themselves are relatively inexpensive.

Thus, while it is possible that certain consumers of RYO or MYO tobacco, and related products, will exercise a higher degree of care in making their purchase, this is not necessarily always the case. In the event that the parties' marks are used on the relatively inexpensive bulk RYO or MYO tobacco, it is feasible that consumers exercising only the usual amount of care or diligence would make an impulse

18

purchase.  Moreover, even as to the more expensive tobaccos,

the facts here are distinguishable from circumstances where

the goods are complex and extremely expensive, *e.g.*,

scientific or medical equipment, and the overlapping

potential purchasers are limited to very knowledgeable

purchasers in the particular field.  In short, the record

does not support a finding that the goods and purchasing

process are of such a nature that purchasers would exercise

unusual care or otherwise would distinguish similar marks

for related goods.  See, *e.g.*, *Electronic Design & Sales,*

*Inc. v. Electronic Data Sys. Corp.*, 954 F.2d 713, 21 USPQ2d

1388 (Fed. Cir. 1992).  Accordingly, to the extent this

factor weighs at all in favor of North Atlantic, it is not

sufficient to outweigh the other *du Pont* factors.

*Du Pont Factors 5 & 6:*
*Number and Nature of Similar Marks in Use*
*On the Same or Similar Goods*
*and*
*Strength of*
*Top's Mark, CLASSIC CANADIAN*

Before addressing the ever important *du Pont* factor

involving the degree of similarity of the parties' marks, we

first consider several additional factors argued by North

Atlantic that go to the essence of its defense.  That is,

North Atlantic argues in its brief that there is extensive

use by third parties of marks containing the term CLASSIC,

for tobacco-related products, and "[i]t is clear...that both

consumers and the Trademark Office have easily distinguished among these marks when viewing them in their entireties." Brief, p. 26.  In support, it relies on numerous third-party registrations for marks containing the term CLASSIC as well as several examples of use of the same term either as an element of a mark or being used in the description of the goods.  North Atlantic also argues that Top's pleaded mark, CLASSIC CANADIAN, is inherently a weak mark in reference to tobacco products because CLASSIC is a highly suggestive term and CANADIAN merely describes a tobacco style or blend.

The sixth *du Pont* factor requires us to consider evidence pertaining to the number and nature of similar marks in use on similar goods.  "The purpose of a defendant introducing third party uses is to show that customers have become so conditioned by a plethora of such similar marks that customers have been educated to distinguish between different such marks on the bases of minute distinctions." *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005).

On this record, we cannot conclude that there has been such an impact in the marketplace as a result of the term CLASSIC being widely used in marks on tobacco products. Third-party registrations, as acknowledged by the parties, are not evidence that the registered marks actually have

been used in commerce.  As to the evidence of actual use of

the term CLASSIC in third-party marks on tobacco products,

this is not accompanied by any other evidence indicating the

length of time said marks have been in use, the degree of

exposure, or the popularity of such marks vis-à-vis the

relevant purchasing public.  Accordingly, this factor

remains neutral in our analysis.

As to the strength of its CLASSIC CANADIAN mark, Top

does not assert that it is famous.  Rather, it argues that

the mark is "distinctive and strong."  Brief, p. 35.  Top

points to its use of the mark since 1992, promotional

efforts, and its policing efforts with respect to other

marks containing the term CLASSIC in connection with RYO

tobacco products.  Top's witness, Mr. Gold, testified that

the CLASSIC CANADIAN mark has acquired "considerable

consumer recognition" because he believes consumers are

"will[ing to] pay more for Classic Canadian than they would

for a generic brand."  Gold dep.  131:16-132:5.  In

contrast, and as previously indicated, North Atlantic argues

that the CLASSIC CANADIAN mark is entitled to a narrow scope

of protection in view of the inherent weakness of the mark.

In assessing the overall strength of Top's CLASSIC

CANADIAN mark, we consider both its inherent strength based

on the nature of the mark itself and its commercial

strength, based on the marketplace recognition value of the

mark.  *See Tea Board of India v. Republic of Tea Inc.,* 80

USPQ2d 1881, 1899 (TTAB 2006); McCarthy on Trademarks and

Unfair Competition § 11:83 (4th ed. 2011) ("The first

enquiry focuses on the inherent potential of the term at the

time of its first use.  The second evaluates the actual

customer recognition value of the mark at the time

registration is sought or at the time the mark is asserted

in litigation to prevent another's use.")

The record overwhelmingly establishes that the CLASSIC

CANADIAN mark has little intrinsic distinctiveness.  The

term CANADIAN has been disclaimed and the evidence

establishes that it is descriptive or generic for one of

several styles or blends of RYO tobacco.  As to the term

"classic," it is defined as "having lasting significance or

worth; enduring...Of a well-known type; typical."[9]  In its

prosecution of the pleaded registration and in response to

an Office Action, Top relied on a similar definition of

"Classic" and acknowledged the suggestive nature of the term

when used with the term CANADIAN and in the context of the

goods:[10]

---

[9] The American Heritage Dictionary of the English Language (4th
ed. 2000).  The Board may take judicial notice of dictionary
definitions.  University of *Notre Dame du Lac v. J. C. Gourmet
Food Imports Co., Inc.*, 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d
1372, 217 USPQ 505 (Fed. Cir. 1983).
[10] Copy of response to Office Action submitted under North
Atlantic's notice of reliance.

> Moreover, in [Top's] mark, CANADIAN is modified by CLASSIC, which means "of the highest class; being a model of its kind; excellent; standard; authoritative; established."  Webster's New World Dictionary (2d College ed.)  Thus, while use of the term CANADIAN alone for tobacco goods merely <u>suggests</u> a particular style of goods, [Top's] CLASSIC CANADIAN mark, in its entirety, literally means "model Canadian" or "of a Canadian standard" or "of an established Canadian style."
> (emphasis in original)

Top's statement may be used in evidence to "illumin[ate] the shade and tone in the total picture confronting the decision maker."  *Interstate Brands Corp. v. Celestial Seasonings, Inc.*, 576 F.2d 926, 198 USPQ 151, 154 (CCPA 1978); see also, *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*, 748 F.2d 669, 223 USPQ 1281, 1283 (Fed. Cir. 1984) (applicant's earlier contrary position taken before the examining attorney as to the meaning of its mark, as demonstrated by statements in the application illustrating the variety of meanings that may be attributed to, and commercial impression projected by, applicant's mark, may be relevant); See also, TBMP §§ 704.03(b)(2) and 704.04 (3rd ed. 2011) and authorities cited therein. Nevertheless, "a party's earlier contrary opinion may be considered relevant and competent.  Under no circumstances, may a party's opinion, earlier or current, relieve the decision maker of the burden of reaching his own ultimate conclusion on the entire record."  *Interstate Brands*, 198 USPQ at 154.  Thus, we do not construe Top's previous

statement by itself as conclusive on the issue of the
commercial impression or connotation of its mark; rather, it
is relevant evidence in support of our conclusion, based on
the entire record, that the term CLASSIC and the mark as a
whole are highly suggestive in connection with the goods.

North Atlantic has submitted several third-party
registrations for marks incorporating the term "Classic" in
connection with tobacco-related products.[11]  These include:

- CLASSIC COLLECTION for "cigars, little cigars, pipe
  tobacco and smokeless tobacco";[12]

- CLASSIC DUMAURIER FLAVOUR DUE M LA SAVEUR CLASSIQUE
  DUMAURIER (with design) for "cigarettes, tobacco,
  cigarette cases not of precious metal, ashtrays not of
  precious metal, tobacco pipes not of precious metal,
  lighters not of precious metal, matches" (the terms
  CLASSIC, FLAVOUR and LA SAVEUR CLASSIQUE, are
  disclaimed);[13]

- SOUTHERN CLASSIC for "cigarettes, smoking tobacco,
  cigars, cigarillos";[14]

- STOKER'S CLASSIC for "smokeless tobacco";[15] and

- ZINO CLASSIC BRAZIL for "cigars" (BRAZIL disclaimed).[16]

While these registrations are not evidence that said
marks are in actual use, their existence indicates the term

---

[11] We note that of the 20 registrations submitted, several have
(since the trial) been cancelled.
[12] Reg. No. 3681480 issued on September 8, 2009.
[13] Reg. No. 3260348 issued on July 10, 2007.
[14] Reg. No. 2813638 issued on November 28, 2011, Section 8
affidavit accepted and Section 15 affidavit acknowledged.
[15] Reg. No. 2359709 issued on June 20, 2000; renewed, Section 8
affidavit accepted and Section 15 affidavit acknowledged.
[16] Reg. No. 2026863 issued on December 31, 1996; renewed, Section
8 affidavit accepted and Section 15 affidavit acknowledged.

CLASSIC has a suggestive meaning as applied to tobacco products. *Tektronix, Inc. v. Daktronics, Inc.,* 187 USPQ 588, 592 (TTAB 1975) (the third-party registrations may be considered in the same manner as a dictionary to show a possible meaning or significance in a particular trade). Given its defined meaning and in the context of tobacco, the term may be understood as suggestive of the type of tobacco, cigarettes, cigars, etc., as having a lasting worth or being of a well-known type. The suggestive attributes of this term are not lost in Top's mark; rather, those attributes are accentuated by the latter term, CANADIAN, a particular blend or style of tobacco. In other words, Top's mark will be understood as suggesting a "Canadian" blend of tobacco that is "of a well-known type" or is "typical" of such blend. The fact that the USPTO has allowed so many registrations for the tobacco-related goods containing a shared term to co-exist on the Principal register may be used "to establish that [the] portion common to the marks involved in a proceeding has a normally understood and well-known meaning [and] that this has been recognized by the [USPTO]...; and that therefore the inclusion of [the shared term] in each mark may be an insufficient basis on which to predicate a holding of confusing similarity." *Red Carpet Corp. v. Johnstown American Enterprises Inc.*, 7 USPQ2d 1404, 1406 (TTAB 1988).

As to the commercial or market strength of Top's CLASSIC CANADIAN mark, we are able to conclude on the record before us that while Top has had some commercial success in sales, there is not enough context or evidence of consumer exposure to the mark sufficient to establish that it is a strong mark. Although Top has been using the mark for approximately twenty years and has enjoyed what appears to be significant annual sales for its CLASSIC CANADIAN tobacco, it has not been established that this mark has acquired renown or a high degree of consumer recognition.

In view of the foregoing, we find that the CLASSIC CANADIAN mark is inherently a weak mark because it is highly suggestive for tobacco and that the evidence regarding the commercial strength of that term does not overcome the mark's intrinsic shortcoming. This certainly favors North Atlantic to the extent that such marks are often accorded a narrower scope of protection. Nevertheless, we are mindful that even a weak mark is entitled to protection against the registration of a very similar mark for closely related goods. See *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 109 (CCPA 1974) (likelihood of confusion is to be avoided as much between weak marks as between strong marks).

26

*Similarity of the Marks*

With the above in mind, particularly the immediately preceding section discussing the relative strength of Top's pleaded mark, we turn now to the *du Pont* factor concerning the similarity or dissimilarity of the parties' marks. In comparing the marks, they are viewed in their entireties in terms of appearance, sound, connotation and commercial impression. *See Palm Bay Imports, Inc.*, 73 USPQ2d 1689.

While we have considered the relative weakness of Top's CLASSIC CANADIAN mark, we also keep in mind that when marks would appear on identical goods, as they do in part here, the degree of similarity between the marks necessary to support a finding of likelihood of confusion declines. See *Century 21 Real Estate v. Century Life*, 970 F.2d 874, 23 USPQ2d 1698 (Fed. Cir. 1992).

We first compare Top's CLASSIC CANADIAN mark to North Atlantic's CLASSIC AMERICAN BLEND marks. The most obvious similarity between these marks, in terms of appearance and sound, is they all begin with the word CLASSIC. The marks are also similar in their syntax to the extent that the term CLASSIC is followed by a name of a specialty blend of tobacco, CANADIAN and AMERICAN, respectively. The additional term, BLEND, in North Atlantic's mark is generic and does very little to distinguish it from Top's mark. In terms of commercial impression and connotation, the marks

27

are equally highly suggestive of a style of tobacco.  As previously explained, Top's mark will be understood, in the context of tobacco, as describing the blend of tobacco, *i.e.*, Canadian, and suggesting that said blend is "of a well-known type" or is "typical."  North Atlantic's mark, likewise, also describes a blend of tobacco, *i.e.*, an American blend, and suggests that the tobacco is "of a well-known type" or is "typical."  The parties' marks are similar in that they have a simplistic commercial impression, a "classic" specialty blend of tobacco.

　　We do note, however, that in North Atlantic's mark:



the term AMERICAN is accentuated.  While the term AMERICAN is larger, again, it is descriptive of the goods, and as such the source-identifying element remains the term "classic."  The banner-style design also does not sufficiently distinguish the marks so as to overcome the similarities based on the common element CLASSIC and the similar overall structure of the marks, i.e. combining CLASSIC with the name of a specialty blend of tobacco.  In view thereof, we find that North Atlantic's CLASSIC AMERICAN BLEND marks are similar to Top's mark.

As to North Atlantic's registered mark, ZIG ZAG CLASSIC AMERICAN BLEND, while it contains the same phrase "CLASSIC AMERICAN BLEND" as the marks discussed above, the addition of the distinctive house mark ZIG ZAG to the highly suggestive phrase is sufficient in this case to outweigh the similarities. Our comparison of these marks is quite different due to the presence of this distinctive house mark. Indeed, the Board has frequently determined that additional distinctive elements, such as North Atlantic's ZIG ZAG house mark, may avoid likely confusion where the marks in their entireties convey significantly different commercial impressions or the matter common to the marks is so suggestive or weak that any source-indicating value it has is overwhelmed by the addition of an arbitrary, distinctive element. *See, e.g.*, *Rocket Trademarks Pty Ltd. v Phard S.p.A.*, 98 USPQ2d 1066 (TTAB 2011)(ZU ELEMENTS (stylized) not confusingly similar to ELEMENTS in connection with identical clothing goods due, in part, to suggestiveness of term "elements"); and *Knight Textile Corp. v. Jones Investment Co.*, 75 USPQ 1313 (TTAB 2005)(the mark ESSENTIALS found so highly suggestive that addition of house mark NORTON MCNAUGHTON sufficed to distinguish the marks). Again, we do not find that the common element, CLASSIC, in the parties' marks is merely descriptive but the record does

show that it is highly suggestive and weak.[17]  As used in North Atlantic's ZIG ZAG CLASSIC AMERICAN BLEND mark, the term CLASSIC will not likely be perceived by purchasers as distinguishing source.  That is, consumers encountering this mark will focus on the ZIG ZAG element and relegate the wording CLASSIC AMERICAN BLEND as highly suggestive of the tobacco goods.  In view thereof, we find in the case of applicant's ZIG ZAG CLASSIC AMERICAN BLEND mark, the dissimilarities outweigh the similarities.

*Lack of Instances of Actual Confusion*

North Atlantic has argued that the parties' marks have coexisted for over ten years without any instances of known actual confusion, being used on the same type of RYO tobacco and advertised to the same class of customers in the same trade channels.  We further note that while Top's sales of goods have been impressive, North Atlantic has enjoyed more success in the sales of its RYO or MYO tobacco goods being sold under the objected-to marks.  Indeed, on this record, we can find that there has been a significant period of time and reasonable opportunity for confusion to have existed. Under such circumstances, the absence of any actual

---

[17] Top's CLASSIC CANADIAN registration is on the Principal Register without a disclaimer of the term CLASSIC; nor did it register under Section 2(f).  It is also not the subject of a counterclaim.  Accordingly, under Section 7 of the Act, we cannot entertain any attack on this registration, or the term CLASSIC itself, as being merely descriptive.

confusion may be probative. *Gillette Canada Inc. v. Ranir Corp.,* 23 USPQ2d 1768, 1774 (TTAB 1992); see also, e.g., *Barbara's Bakery Inc. v. Landesman,* 82 USPQ2d 1283, 1287 (TTAB 2007) (the probative value of the absence of actual confusion depends upon there being a significant opportunity for actual confusion to have occurred); *Red Carpet Corp. v. Johnstown American Enterprises Inc.,* 7 USPQ2d 1404, 1406-1407 (TTAB 1988); *Central Soya Co., Inc. v. North American Plant Breeders,* 212 USPQ 37, 48 (TTAB 1981) ("the absence of actual confusion over a reasonable period of time might well suggest that the likelihood of confusion is only a remote possibility with little probability of occurring").

Accordingly, we find that the lack of any evidence of actual confusion slightly weighs in favor of a finding that confusion would not be likely to occur from the continued contemporaneous use of the marks.

*Top's Reverse Confusion Argument*

In its brief, Top acknowledges that "sales under [North Atlantic's] ZIG ZAG CLASSIC AMERICAN BLEND and CLASSIC AMERICAN BLEND Marks have now likely exceeded Top's sales of its CLASSIC CANADIAN Mark, despite Top being the senior user." Brief, p. 39. Top argues that, in light of North Atlantic's success, consumers may first become familiar with North Atlantic's marks and later encounter Top's mark. Top

argues that "reverse confusion" is thus likely as consumers may then mistakenly believe that tobacco or related goods being sold under Top's mark emanate from North Atlantic.

The Federal Circuit, our primary reviewing court, has elaborated on the subject of "reverse confusion."

> The term "reverse confusion" has been used to describe the situation where a significantly larger or prominent newcomer "saturates the market" with a trademark that is confusingly similar to that of a smaller, senior registrant for related goods or services. The junior user does not seek to benefit from the goodwill of the senior user; however, the senior user may experience diminution or even loss of its mark's identity and goodwill due to extensive use of a confusingly similar mark by the junior user.
>
> The avoidance of confusion between users of disparate size is not a new concept; however, the weighing of the relevant factors must take into account the confusion that may flow from extensive promotion of a similar or identical mark by a junior user. In considering likelihood of confusion as to the source of services that are not identical, or likelihood of confusion as to whether there is a relation between the source of the services, the extent of the registrant's and the newcomer's activities relating to the mark must be given weight appropriate to the circumstances.

*In re Shell Oil Co.*, 992 F.2d 1204, 1207, 26 USPQ2d 1687, 1690 (Fed. Cir. 1993)(citations omitted.)

On the record before us, we find that reverse confusion is not any more likely than "forward" confusion or that the relevant facts are such that our likelihood of confusion analysis requires any adaptation. In particular, it has not been shown that North Atlantic is a 'significantly larger or prominent newcomer' who has 'saturated the market' with its RYO tobacco-related goods sold under the objected-to marks.

32

Accordingly, Top's arguments concerning reverse confusion do not compel any change in our ultimate determination regarding likelihood of confusion between the parties' marks.[18]

### *Conclusion*

Having found that Top's CLASSIC CANADIAN mark and North Atlantic's marks CLASSIC AMERICAN BLEND and CLASSIC AMERICAN BLEND with design are similar, that the goods are identical in part, and that said goods move in the same trade channels and are available to the same classes of purchasers, we find that North Atlantic's use of said marks is likely to cause confusion with Top's mark.  To the extent that any doubt might exist as to the correctness of our likelihood of confusion conclusion, we resolve such doubt against applicant.  *See Century 21 Real Estate Corp., supra; Ava Enterprises Inc. v. Audio Boss USA Inc.*, 77 USPQ2d 1783

---

[18] North Atlantic objected to Top's raising the issue of "reverse" confusion for the first time in its trial brief, and requests said argument be stricken.  Brief, p. 36.  North Atlantic asserts that "reverse confusion is a distinct claim from forward confusion and differs in several key respects."  Brief, p. 37. The Board has previously found that "[reverse confusion] does not have to be specifically pleaded so long as the plaintiff asserts that the respective marks are so similar as applied to the respective goods or services as to be likely to cause confusion." American Hygienic Laboratories, Inc. v Tiffany & Co., 12 USPQ2d 1979, at footnote 7 (TTAB 1989).  Inasmuch as Top did plead a likelihood of confusion, as described previously, we find no prejudice to North Atlantic in this regard and the objection is overruled.

(TTAB 2006); and *Baseball America Inc. v. Powerplay Sports Ltd.*, 71 USPQ2d 1844 (TTAB 2004).

On the other hand, we find that North Atlantic's mark ZIG ZAG CLASSIC AMERICAN BLEND is sufficiently dissimilar from Top's mark CLASSIC CANADIAN to make confusion unlikely and that this du Pont factor is dispositive. *Kellogg Co. v. Pack'em Enterprises Inc.*, 951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991) ("We know of no reason why, in a particular case, a single duPont factor may not be dispositive").

Alleged Failure to Use Mark Prior to Registration

With regard to Top's claim that North Atlantic failed to use the registered mark ZIG ZAG CLASSIC AMERICAN BLEND in commerce prior to obtaining the registration, it is not in dispute that North Atlantic sold RYO or MYO tobacco in commerce prior to the issuance of its registration using the following packaging (photographs of canisters):



The side of this canister is depicted as follows, including a close-up photograph of bordered text describing the contents:

 

Top argues that this packaging does not show use of the registered mark "as a single, contiguous mark with a unitary commercial impression." Brief, p. 41. In particular, Top contends that the elements ZIG ZAG and CLASSIC AMERICAN

BLEND on the front of the canister are displayed in "radically different fonts" and have the wording "Cigarette Tobacco" separating them. *Id.* As to the side of the canister, Top argues that the highlighted portion is "an informational text box" displaying the element ZIG ZAG in a stylized font different from the CLASSIC AMERICAN BLEND element which, according to Top, is "in standard font in the same black text as the rest of the text" in the paragraph. *Id.* at 42.

We disagree with Top. We find that the canister shows use of North Atlantic's registered mark and, accordingly, Top's claim that North Atlantic failed to use the mark prior to its registration fails.

Although the front of the canister displays the element ZIG ZAG separated from CLASSIC AMERICAN BLEND with the wording "Cigarette Tobacco," the two elements forming North Atlantic's registered mark remain in relative proximity to each other. The wording "cigarette tobacco" is generic for the goods and does not impart or inject a separate commercial impression between the two elements. Even if we were to conclude that consumers would not view the front of the canister and perceive ZIG ZAG CLASSIC AMERICAN BLEND as a single, unitary mark, the side of this canister clearly shows the registered mark without any matter separating the

36

elements.[19]  ZIG ZAG (in stylized lettering) is immediately followed by "Classic American Blend."  Although the latter element appears in a different font from the former, the first letter of each word is capitalized and thus separates it from the remaining text.  Such use has been determined as sufficiently separating the mark from other elements.  *See, e.g.*, *Plyboo America Inc. v. Smith & Fong Co.*, 51 USPQ2d 1633, 1638 (TTAB 1999) ["the term 'plyboo' is clearly used as a trademark for applicant's goods -- in that the first letter of such term (like a proper noun or proper adjective) is capitalized, or the term is otherwise set off by quotation marks, *and* the term is followed (or preceded) by generic terminology for the goods"].  The notion that consumers would likely perceive the ZIG ZAG CLASSIC AMERICAN BLEND as a single, unitary mark is reinforced due to its repetition (in the same style lettering) near the end of the same informational box.

Ultimately, we conclude that the tobacco canister, which again Top conceded was being sold in commerce prior to registration of North Atlantic's mark, is sufficient for

---

[19] North Atlantic's use of the registration symbol ® following the term ZIG ZAG indicates that it has registered the term ZIG ZAG by itself as a separate trademark.  This does not preclude North Atlantic from asserting rights in ZIG ZAG, by itself, as well as incorporating that mark with additional elements to form a second, different trademark.  In this regard, we note we have long held that packaging for a product may contain multiple

purposes of establishing use of the mark ZIG ZAG CLASSIC

AMERICAN BLEND.

**Decision**:  Oppositions Nos. 91157248, 91157250 and

91180231 are sustained and registration is refused to North

Atlantic with respect to the subject applications.

Cancellation No. 92043186 is dismissed.

---

marks. See *Safe-T Pacific Company v. Nabisco, Inc.*, 204 USPQ 307,
315 (TTAB 1979).